**IN THE COURT OF APPEALS OF IOWA**

No. 14-1691
Filed July 22, 2015

**IN THE INTEREST OF G.B. and A.B.,**
    **Minor children,**

**B.C.,**
    Petitioner-Appellee.

**K.B., Mother,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Poweshiek County, Rose Anne

Mefford, Judge.


The mother appeals from an order terminating her parental rights pursuant

to Iowa Code chapter 600A. **AFFIRMED.**


Dustin D. Hite of Heslinga, Dixon, Moore & Hite, Oskaloosa, for appellant.

Diane Crookham-Johnson of Crookham-Johnson Law Office, P.L.L.C.,

Oskaloosa, for appellee.

Terri Menninga, Pella, attorney and guardian ad litem for minor children.


Considered by Doyle, P.J., and Tabor and McDonald, JJ.

**MCDONALD, J.**

The mother appeals an order terminating her parental rights to her children, G.B., age ten at the time of trial, and A.B., age seven at the time of trial. The district court terminated the mother's rights in her children pursuant to Iowa Code section 600A.8(3) (2013), finding that there was clear and convincing evidence the mother abandoned the children and that the termination of her parental rights was in the children's best interest. We affirm.

I.

The mother has not been responsible for the day-to-day care of her children since 2007. Since that time, the children have lived with their paternal grandparents, with the exception of a brief period of time in 2008 when the children resided with the mother in an in-patient drug treatment facility. When the mother was "kicked out" of the program, the children went back to live with their grandparents. The grandparents were named legal guardians of the children in 2008 following a child in need of assistance (CINA) proceeding. The court granted the mother visitation every other weekend and every Wednesday afternoon.

Until 2010, the grandparents and the children lived in the hamlet of Newburg near Grinnell, Iowa. The mother testified that for the majority of that time she lived with the grandparents and helped care for the children. The grandmother testified the mother lived intermittently with them during that time, as the mother also lived in four different cities during those two years. The record reflects that when the mother was at the grandparents' home, she often

slept until noon and failed to take her psychiatric medications. The mother has been diagnosed with bipolar disorder, a condition she has suffered since her teenage years.

In 2010, the grandparents and the children moved to Arkansas. Following the move, the grandparents filed a request to modify the visitation rights of the mother. In response, the mother sought to terminate the grandparents' guardianship of G.B and A.B. The court denied the mother's request to terminate the guardianship. The court compared the mother's inability to provide parental care with the grandparents' "excellent day-to-day care" of the children. The court noted that the mother "has never pursued a course of regular and meaningful contact with the boys in the past." Also significant to the court's decision was the mother's failure to sustain a stable home, her inability to remain compliant with her prescribed psychiatric care, and her inability to protect her kids from the perils of her own lifestyle. The court changed the mother's visitation rights, requiring only that the guardians "openly communicate with [the mother] regarding the wards' activities, growth and development, schooling, health, and religious involvement." The court also ordered the grandparents to accommodate the mother's "reasonable requests for telephonic, Internet, and/or in-person visitation."

While the children were living with their grandparents in Arkansas, the financial situation of the grandparents and the mother prevented frequent visits between the children and their mother. The children visited the mother only two times between 2010 and 2012. On each occasion, the grandparents facilitated

the visitation. The parties agree that telephone communication was also minimal but they disagree on the reason. The mother testified that she called multiple times per week but "their phone was messed up" and she could "barely get ahold of them." The grandmother testified their telephone had always worked. The mother and the grandmother did communicate via Facebook during this time. The record also reflects the mother had some communication via Facebook with G.B. during this time.

In May of 2012, the grandparents moved the children back to Iowa. The mother, who was living in Mason City at the time, immediately moved in with her best friend in Grinnell to be closer to the children. Initially, the mother saw the children often. Toward the end of 2012, the mother testified, the grandmother pressed her to terminate her parental rights. The mother's testimony is partially corroborated by a Facebook message sent by the grandmother encouraging the mother to "sign the papers," so that "the children will have something after [the Grandfather] is gone." The grandmother testified she wanted the mother to agree to the termination of her rights to facilitate adoption of the children, which would entitle the children to Social Security benefits if the grandfather deceased, which he did while this case was pending on appeal.

In January 2013, the mother moved to New Mexico to be with her family and "support system." She cited the grandmother's strict visitation policy and her inability to find work in Iowa as other reasons for the move. The mother still resides in New Mexico. While in New Mexico, the mother has maintained full-time employment as a hotel desk clerk, at the time of trial earning $8.75 per hour.

Since the mother's move to New Mexico, she has seen her sons on only two occasions, both coincident with travel to Iowa for court proceedings. The grandmother required the visits to be supervised because G.B. told her, "all [the mother] does is yell at him and hit him" and because "[the mother] has nowhere to take [the children]." The grandmother estimated the mother has talked with the children on the telephone seven times since the move. She also testified the mother often failed to call after promising the children she would. The mother had been communicating with G.B. via Facebook prior to the move to New Mexico, but since the move they only had one short exchange, which was during April of 2013.

In May 2013, the grandparents filed a petition to terminate the mother's and the father's parental rights. The father gave written consent to the termination of his rights, and his rights are not the subject of this appeal. The children's guardian ad litem recommended termination of the mother's parental rights. The basis for her recommendation was the mother's lack of contact with the children, the mother's inability to appreciate the effort exerted by the grandparents in caring for the children, and the absence of stability in the mother's life. Included in the guardian ad litem's report is an email from G.B.'s Behavioral Health Intervention Services provider, which also recommends termination based on the lack of involvement and the negative effect this has had on G.B.'s behavior.

Following trial, the juvenile court found and concluded the mother had abandoned the children. The juvenile court terminated the mother's parental

rights pursuant to Iowa Code section 600A.8(3). The juvenile court specifically credited the grandparents' testimony over the mother's testimony where there was conflicting testimony. The court also found and concluded that "[t]ermination would benefit these children in that they would have permanency and stability with adoption by the Petitioners." The mother timely filed this appeal.

## II.

Our review is de novo. *See In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998). While not bound by the factual findings of the court below, we give weight to the district court's findings, especially regarding the credibility of witnesses. *See id.*

## III.

In a private termination proceeding, the petitioners must establish by clear and convincing evidence the statutory ground or grounds authorizing the termination of parental rights. *See* Iowa Code § 600A.8; *R.K.B.*, 572 N.W.2d at 602. If the statutory grounds are proved, the petitioners must also prove that termination of parental rights is in the best interests of the children. *See* Iowa Code § 600A.8; *R.K.B.*, 572 N.W.2d at 602. While the best interests of the children is the primary concern of the termination proceeding, the interests of the parents shall be given due consideration. *See* Iowa Code § 600A.1; *R.K.B.*, 572 N.W.2d at 601.

Abandonment of a minor child is one of the grounds supporting the termination of parental rights authorized by Iowa Code chapter 600A. *See* Iowa Code § 600A.8(3). Chapter 600A defines abandonment of a minor child as

"reject[ing] the duties imposed by the parent-child relationship . . . , which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." *Id.* § 600A.2(19). Specifically,

> If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.
> . . . .
> c. The subjective intent of the parent, whether expressed or otherwise, unsupported by evidence of acts specified in paragraph "a" or "b" manifesting such intent, does not preclude a determination that the parent has abandoned the child. In making a determination, the court shall not require a showing of diligent efforts by any person to encourage the parent to perform the acts specified in paragraph "a" or "b". In making a determination regarding a putative father, the court may consider the conduct of the putative father toward the child's mother during the pregnancy. Demonstration of a commitment to the child is not met by the putative father marrying the mother of the child after adoption of the child.

*Id.* § 600A.8(3)(b)-(c). Contrary to the mother's assertion, the petitioners need not establish her subjective intent to abandon the children. *See* Iowa Code § 600A.8(3)(c); *In re G.A.*, 826 N.W.2d 125, 128 (Iowa Ct. App. 2012) (recognizing that a parent's subjective intent does not preclude a finding of

abandonment); *In re C.J.F.M.*, No. 10-0166, 2010 WL 3157756, at *2 (Iowa Ct. App. Aug. 11, 2010) (recognizing the "intention to abandon is no longer a statutory element in the definitions of Iowa Code Chapter 600A"). On de novo review, we conclude there is clear and convincing evidence of abandonment.

There is clear and convincing evidence the mother failed to contribute support in a reasonable amount to the children. *See* Iowa Code § 600A.8(3)(b). Prior to the termination petition being filed, the mother provided three payments of child support totaling $250, as well as informal support of at least $290. The mother had previously been ordered to pay $165 per month in support of the children. At the time of trial, the mother estimated her outstanding obligation was approximately $12,000.

The mother contends that she was financially unable to provide more than nominal support to the children during the relevant time period and that the statute's language, "according to the parent's means," recognizes this as an excuse for failure to provide "support of a reasonable amount." This court has recognized a parent's financial inability to contribute to the support of the children as a justification for the failure to contribute to the support of the children. *See, e.g.*, *In re C.C.S.*, No 14-1010, 2015 WL 576381, at *3 (Iowa Ct. App. Feb. 11, 2015) (upholding the district court's finding of no abandonment when the mother failed to pay child support but was unemployed); *In re J.J.*, No. 08-2026, 2009 WL 1492860, at *6 (Iowa Ct. App. May 29, 2009) (finding reasonable support according to the father's means when he had satisfied only forty-five percent of his court-ordered obligation due to his low income). Those cases are predicated

on the assumption the parent is making a good faith effort to provide support to the children. Here, the mother, due to her own conduct and instability, failed to provide almost any support for her children for more than five years. The Iowa Supreme Court has described the "abnegation of court-ordered financial responsibility to a child" as "the equivalent of abandonment." *In re Kelley*, 262 N.W.2d 781, 785 (Iowa 1978).

There is clear and convincing evidence the mother has failed to visit the children monthly. *See* Iowa Code § 600A.8(3)(b)(1). Since the mother moved to New Mexico in January of 2013, she visited the children on only two occasions. On both of the occasions, the mother's visitation was related to this court proceeding. While it is undisputed the mother lacked the means to visit the children monthly while in New Mexico, "self-imposed" barriers do not excuse the mother's conduct. *See, e.g., In re M.M.S.*, 502 N.W.2d 4, 7 (Iowa 1993); *In re K.B.*, No. 14-0849, 2015 WL 3884176, at *4 (Iowa Ct. App. Jun. 24, 2015); *In re C.J.F.M.*, No. 10-0166, 2010 WL 3157756, at *3 (Iowa Ct. App. Aug. 11, 2010).

In addition, we agree with the district court's findings that the mother did not otherwise maintain or attempt to maintain regular communication with the children:

> [The mother] testified that she routinely changed telephone numbers or was without a telephone. [The mother] frequently sent Facebook messages to the petitioner . . . providing a new contact number or the fact that she did not have a contact number. [The mother] admitted that for significant periods of time, she was difficult to reach by telephone. During 2013 [the mother] attempted communication with the children only two times the entire year via [the Grandmother]. For 2014 there has been no attempted communication via [the Grandmother]. [The mother] had direct contact with [G.B.] via Facebook, as demonstrated in mother's

> Exhibit B. [The mother] communicated with [G.B.] nine times in 2011, five times in 2012, two times in 2013, and has made no contact in 2014. [The mother] was not able to demonstrate that she has had any direct contact with [A.B.] since 2008.

The decreasing contact with the children is clear and convincing evidence supporting a finding of abandonment. *See* Iowa Code § 600A.8(3)(b)(2); *In re K.M.*, No. 14-1374, 2015 WL 1849508, at *6 (Iowa Ct. App. Apr. 22, 2015) ("A few sporadic text messages over the period of a few months . . . do not rise to any sort of meaningful contact that may fend off a claim of abandonment, particularly given the father did not attempt any other type of communication—or offer financial or emotional support—to K.M."); *In re G.A.*, 826 N.W.2d at 130 (affirming termination order where the father communicated with the mother via "sporadic text messages" over the course of several months and made no attempts to follow up when the mother imposed reasonable restrictions on visitation); *In re D.S.P.*, No. 09-1188, 2010 WL 445690, at *3 (Iowa Ct. App. Feb. 10, 2010) (holding the father abandoned his daughter when he "largely gave up" on communication after his first attempts were unsuccessful).

Once the statutory requirements for termination have been met, the petitioner must also show that the termination of parental rights is in the best interest of the child. *See R.K.B.*, 572 N.W.2d at 602. Chapter 600A provides:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code § 600A.1. The Iowa Supreme Court has found the statutory best interest factors in chapter 232 termination cases relevant to chapter 600A termination cases. *See In re A.H.B.*, 791 N.W.2d 687, 690 (Iowa 2010). The child's "emotional and psychological health" is an important consideration. *Id.* (citing Iowa Code § 232.116(2)). Weight is also given to the "closeness of the parent-child bond." *Id.* at 691 (citing Iowa Code § 232.116(3)(c)).

Regarding the emotional and psychological health of the children, in the 2010 guardianship proceeding, the court described the grandparents' care of the children as "excellent." The district court in this case described the grandparents as "very capable" of adopting the children. There is no doubt that termination of the mother's rights and continued care of the children by the grandmother would provide the children with stability and permanency. Considering the length of time the grandparents have provided a stable home for the children—seven years—waiting any longer to finally determine the children's permanent placement would appear to "'deprive [them] of permanency after the petitioner has proved a ground for termination . . . by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child.'" *A.H.B.*, 791 N.W.2d at 691 (quoting *In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010)).

The mother cites *In re Burney* for the proposition that "ordinarily the long-range best interests of children are better served when they are returned to their parents at the end of the temporary exigency." *In re Burney*, 259 N.W.2d 322, 325 (Iowa 1977). In *Burney*, a teenage mother agreed to place her child temporarily with a married couple as guardians. *Id.* at 323. The mother, with the

support of her new husband, then sought termination of the guardianship and custody of the child two years later but the guardians resisted. *Id.* The *Burney* court sought to avoid discouraging parents from seeking "help with their children in cases of hardship or necessity." *See id.* at 325. This case is clearly distinguishable. The mother in this case was not faced with a "temporary exigency." For seven years she has demonstrated that she cannot meet the needs of her children:

> The [M]other . . . admitted through her own testimony that she has never spent a night with the children by herself since 2007. She further admitted that she has not been responsible for parenting her children without assistance from others for even a daytime visit since 2007. Between 2008 and 2013, the mother's residence changed on a regular basis, varying between at least three states and six towns.
>           . . . .
> [The mother] testified that she has never attended a doctor's appointment or public health appointment for either of the minor children and has nothing to follow up on health issues regarding the children.

The past performance of the mother as a parent is significant, "for that performance may be indicative of the quality of the future care the parent is capable of providing." *R.K.B.*, 572 N.W.2d at 601. These children should no longer have to wait for stability in their lives.

IV.

For the foregoing reasons, we affirm the order terminating the mother's parental rights.

**AFFIRMED.**