# IN THE COURT OF APPEALS OF IOWA

No. 18-1433
Filed November 6, 2019

**IN THE INTEREST OF K.C.,**
**Minor Child,**

**S.K., Mother,**
    Petitioner-Appellee,

**P.C., Father,**
    Respondent-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Dustria A. Relph, Judge.

A father appeals the private termination of his parental rights. **AFFIRMED.**

Britt Gagne of Gagne Law Office, Des Moines, for appellant.

Katie M. Naset of Hope Law Firm & Associates, P.C., West Des Moines, for appellee.

Eric W. Manning of Manning Law Office, PLLC, Urbandale, guardian ad litem for minor child.

Considered by Potterfield, P.J., and Mullins and Greer, JJ.

**POTTERFIELD, Presiding Judge.**

This is an appeal in a private action to terminate parental rights filed pursuant to Iowa Code chapter 600A (2017). The district court terminated the father's parental rights to his child, K.C., pursuant to Iowa Code section 600A.8(3)(b) (abandonment). The father appeals, asserting there is insufficient evidence of abandonment to sustain the termination order and he was denied the effective assistance of counsel. We affirm.

**I. Background Facts.**

S.K., the mother, and P.C., the father, met and began a romantic relationship around 2000. They had K.C. in 2005. The parents never married. Their relationship was fraught with domestic violence, and the mother moved out of the father's residence in "the end of spring" 2008 and moved in with her parents.[1]

The father was working 6:00 p.m. to 6:00 a.m. shifts at his place of employment. He testified he cared for the child during the days. This arrangement ended in July 2009. P.C. next saw K.C. in February 2010. He has paid no child support.

The father sent certified letters to the mother at her parents' residence in June and July 2010. He did not otherwise attempt to see or contact the child. S.K. testified she did not receive either certified letter.

S.K. married O.K. in September 2010 and they moved with K.C. to California. As S.K. testified, "My information in California was public. I had a

---

[1] S.K.'s parents immigrated from Thailand in 1957 and have lived in the same residence since 1976.

California driver's license. My car was registered in California. I had employment in California. I went to college in California. I had no aliases."

P.C. sent a certified letter to S.K. at her parents' residence in August 2011. He was aware S.K. had moved out of state. Though earning more than $65,000 per year, P.C. did not attempt any legal means to locate or contact K.C.[2]

On October 31, 2017, P.C. became aware K.C. was living in Iowa when he saw S.K. in a vehicle dropping off a child at the same school where he was dropping off his girlfriend's child. P.C. had his girlfriend call the school and ask that K.C. be told to call her father at a specified phone number. Twelve-year-old K.C. called the number and P.C. determined it was K.C. by asking her birthdate, told her he was her biological father, and told her he could not talk right then because he needed to call an attorney.

On November 14, 2017, S.K. filed a petition to terminate P.C.'s parental rights. However, as of January 16, 2018, P.C. had not yet been located for service and a continuance was granted.

On February 15, 2018, P.C. filed a petition to establish paternity, custody, support, and visitation.

---

[2] P.C. testified he did speak to an attorney in the summer of 2011. He stated:
> [S]he told me that it was too late to fight in the state of Iowa because— because if [S.K.] moved somewhere else, California—if she stayed there, okay, stayed there for six months, then I would have to go fight in California. But it's no excuse because California was too far.
> But it would be too hard for me to—to try to—try to see [K.C.] because—because I would disrupt her life in California, because if I were to see her it would be twice or three times a year. That would be toxic, you know.

Notice of the termination proceeding was served on P.C. on February 27. P.C.'s privately retained counsel filed an appearance in the termination proceeding on February 28.

On March 15, the juvenile court entered an order "that the trial of this matter [termination petition] shall be heard on the same day as the motion for temporary matters is scheduled in [the custody matter] since a decision in either case will impact how each of the cases proceeds."

On July 11, the juvenile court heard testimony from S.K., P.C., S.K.'s father, husband, and brother, as well as P.C.'s girlfriend. On July 22, the court entered its findings of fact, conclusions of law, and judgment terminating P.C.'s parental rights pursuant to Iowa Code section 600A.8(3)(b) and dismissed the paternity action.

P.C. appeals.

## II. Scope and Standards of Review.

We review termination-of-parental-rights proceedings de novo. *See In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010). "We accord weight to the factual findings of the juvenile court, especially those regarding witness credibility, but we are not bound by them." *Id.* It is the petitioner's burden to prove each element of the case by clear and convincing evidence. *Id.*

## III. Discussion.

*A. Sufficiency of the evidence of abandonment.* Section 600A.8(3)(b) provides that if a child is six months of age or older, a parent is deemed to have abandoned a child "unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward the

support of the child of a reasonable amount, according to the parent's means" and as demonstrated in any of three ways: (1) visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child; (2) communicating on a regular basis with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child; or (3) openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

P.C. acknowledges he has not seen the child since February 2010 and that he has not provided any support. He seeks safe harbor in paragraph 2 above, claiming he was prevented from seeing K.C. He points to S.K.'s testimony at trial that *if* P.C. had sought to contact the child, S.K. would have refused. As we have observed, "A parent may evince an intent to abandon the child even though the parent subjectively maintains an interest in the child if that interest is not accompanied by 'affirmative parenting to the extent practical and feasible in the circumstances.'" *Id.* at 101 (quoting *In re Goettsche*, 311 N.W.2d 104, 106 (Iowa 1981)). Here, even accepting P.C. maintains a subjective interest in the child, he has made no effort to communicate with the child in any manner for many years.

We agree with and adopt the trial court's findings:

> The court finds [P.C.]'s contention that [S.K.] has prevent[ed] him from having a meaningful relationship with K.C. for the past [eight] years to be without merit. Even prior to [S.K.]'s relocation to

California, [P.C.]'s contact with the minor child in Iowa was minimal at best. Following the parties' separation in 2008, [P.C.] provided [S.K.] with no financial support, and only saw the child a handful of times until [S.K.]'s move in September of 2010. [P.C.] took no legal action to establish custody or parenting time prior to or following [S.K.]'s move to California. [S.K.] testified that [P.C.] would have had no issue locating her in California, as her parents have lived in the same home in Iowa for thirty years, her family routinely sees [P.C.] and his family members at social gatherings in the Des Moines [Asian] community. In California, her whereabouts were not secret, as she attended school, was employed, and had utility services established. [S.K.] did admit that she would not have allowed [P.C.] to have contact with K.C. if he had tried, [P.C.] is unable to articulate any real effort made to locate her, have contact with her, or to establish legal custody with respect to K.C. in the past eight years. His most recent efforts have simply come too late. The only conclusion that may be compelled by these facts is that [P.C.] abandoned K.C.

*B. Effective assistance of counsel.* P.C. asserts his privately-retained attorney did not provide effective assistance because he did not have P.C.'s father and sister testify as to the tone of the relationship between the parents' families. He maintains, "The additional witnesses could have better illustrated that the lack of communication and support was due to the intentional desire of the other parent to remove P.C. from K.C.'s life."

Even assuming this claim can be made against retained counsel,[3] in order to prove counsel was ineffective, P.C. must show "(1) that counsel's performance was deficient, and (2) that actual prejudice resulted." *J.P.B.*, 419 N.W.2d at 390 (citations omitted). "Unless both showings are made, the claim must fail." *Id.*

Here, P.C. cannot prove prejudice resulted from the claimed failure to call witnesses because the lack of communication and support between the families

---

[3] Due process considerations require *appointed* counsel to provide effective assistance. *Cf. In re J.P.B.*, 419 N.W.2d 387, 390 (Iowa 1988) (considering chapter 232 termination) *In re D.W.*, 385 N.W.2d 570, 579 (Iowa 1986); *In re D.P.,* 465 N.W.2d 313, 316 (Iowa Ct. App. 1990).

does not excuse P.C.'s conscious choice to not attempt to find K.C. He testified, it "would be too hard for me" to see her "twice or three times a year." *See In re K.C.*, No. 99-1734, 2000 WL 714399, at *3 (Iowa Ct. App. May 31, 2000) ("The case for termination was so overwhelming that the mere addition of a couple character witnesses or the exclusion of some rather meaningless evidence would not have radically altered the court's decision.").

He next asserts counsel was ineffective in failing to object to a conflict of interest between the interpreter used to assist in S.K.'s father's testimony and the father.[4] In essence, the father argues that because S.K.'s father and the interpreter shared a last name, they must share a familial relation and there must have been a bias in favor of S.K. We are not persuaded. Nothing in this record allows us to determine the two were related or even knew one another. The interpreter vowed to "interpret accurately and completely and to the best of [his] ability in accordance with the code of court interpreters." We take the interpreter's vow at face value.

In light of the clear and convincing evidence that the father did not attempt to maintain any contact with the child from 2010 to 2017, and termination of the biological father's rights will allow the child to be adopted by the only father she knows and who has cared for her all these years, we affirm.

**AFFIRMED.**

---

[4] He cites Iowa Court Rule 47.3, which governs the appointment of a court interpreter. We note there is nothing in this record showing the interpreter used was appointed by the court.