# IN THE COURT OF APPEALS OF IOWA

No. 20-0600
Filed December 16, 2020

**IN THE INTEREST OF S.S.,**
**Minor Child,**

**C.L., Mother,**
     Petitioner-Appellee,

**L.S., Father,**
     Respondent-Appellant.
_____

     Appeal from the Iowa District Court for Louisa County, Emily Dean, District

Associate Judge.


     The father of a minor child appeals the juvenile court's decision terminating

his parental rights in this private termination proceeding.  **AFFIRMED.**


     Travis A. Inghram of Inghram Law, PLLC, Burlington, for appellant father.

     Adam D. Parsons, Wapello, for appellee mother.

     Diana L. Miller of Whitfield & Eddy, P.L.C., Mt. Pleasant, attorney and

guardian ad litem for minor child.


     Considered by Doyle, P.J., and Tabor and Ahlers, JJ.

**AHLERS, Judge.**

The mother of S.S., the eight-year-old child who is the subject of this proceeding, filed a petition seeking to terminate the parental rights of S.S.'s father based on abandonment pursuant to Iowa Code section 600A.8(3)(b) (2019). Following trial, the juvenile court terminated the father's parental rights after finding the father abandoned the child within the meaning of Iowa Code section 600A.8(3)(b) and termination was in the child's best interest. On appeal, the father challenges the finding that the mother established the statutory ground of abandonment. He asserts the mother's obstruction of his efforts to visit and communicate with the child negates a finding of abandonment.

S.S. was born in 2011 at a time when the mother and father were married to each other. Within approximately one year of the child's birth, the father was sent to prison, where he remained for approximately three and one-half years. During the early period of the father's incarceration, the mother took the child to see the father a couple of times and the father was able to maintain other contact with the child via phone calls and email communication with the mother. However, the mother eventually filed for and received a stipulated decree of dissolution of the couple's marriage. The mother was granted sole legal custody, and the father was awarded no visitation with the topic of visitation to be reconsidered upon his release from prison.

Almost immediately following his release from prison in the spring of 2016, the father contacted the mother to seek visitation time with the child. The requests were granted, and the father was able to see the child a few times under supervision by others. Approximately six months after his initial release from

prison, the father was sent back to prison for another six months after violating terms of his parole. Following his second release from prison, he was again incarcerated for significant periods of time at least two more times, including a six-month stretch in an Illinois prison. The father had not seen or communicated with the child between 2017 and the termination hearing in 2020.

Following the couple's divorce, the mother remarried and has a child with her new husband. The new husband and the mother have two children together, one younger and one older than S.S. The new husband also adopted the mother's child she had with a third man. The new husband desires to adopt S.S. if freed to do so by termination of the parental rights of S.S.'s father.

We review private termination proceedings de novo. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). Private termination actions under chapter 600A involve a two-step process. *Id.* As the parent seeking termination, the mother must first show, by clear and convincing evidence, that one of the statutory grounds for termination enumerated in section 600A.8 is present. *Id.* Once she has done so, the mother must next show that termination is in the child's best interest. *Id.* She must prove both steps by clear and convincing evidence. *Id.*

The juvenile court found the father abandoned the child within the meaning of Iowa Code section 600A.8 because the father failed to maintain contact with the child. Section 600A.8(3)(b), which concerns children who are six months of age or older at the time of the termination hearing, provides the following:

> [A] parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, *and* as demonstrated by any of the following:

(1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.

(2) Regular communications with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.

(3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

(Emphasis added.)

The statute expressly requires the establishment of two elements by clear and convincing evidence: (1) the parent has failed to maintain "substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means" and (2) the parent has failed to maintain sufficient contact with the child under one of the three alternatives listed in section 600A.8(3)(b)(1)–(3).  *See* Iowa Code § 600A.8(3)(b); *see also In re S.A.*, No. 17-0859, 2018 WL 1182889, at *2 (Iowa Ct. App. Mar. 7, 2018) (noting "the threshold element of 'substantial and continuous or repeated contact' is economic contributions" (quoting *In re K.W.*, No. 14-2115, 2015 WL 6508910, at *3 (Iowa Ct. App. Oct. 28, 2015))).

In this case, there is no claim the child has lived with the father at any time within several years of the termination hearing, so subsection three is not at issue. What remains at issue is whether the father fulfilled his obligations under subsections one or two.  To be more specific, the father does not claim he visited the child monthly or maintained regular communication with the child.  Rather, he asserts his lack of contact and communication was a result of the mother preventing him from doing so.

The father's complaints of the mother's interference with his relationship with the child have merit. If there were a manual explaining ways for a custodial parent to interfere with a non-custodial parent's relationship with a child, the mother seems to have followed the manual in the following ways:

(1)     The mother blocked the father from all her social media, which was the most common method of communication between the parties. In her last communication on social media before blocking the father, she also directed the father to not contact her by phone;

(2)     The mother changed her cell phone number without providing the father with the new number. She acknowledged doing this for the purpose of preventing the father from contacting her via phone;

(3)     The mother directed the father to not come to her residence under the threat of having him arrested for trespass if he did;

(4)     The mother refused to allow the father to even have a lunch visit with the child unless he consented to change the child's last name to that of the mother and her new husband;

(5)     The mother indicated that she was not going to allow the father to see the child without a court order;

(6)     The mother refused to cooperate in the father's efforts to send gifts to the child; and

(7)     Once the father finally grew tired of the lack of contact and filed an action seeking visitation, the mother responded by filing this termination action.

The mother tries to excuse this behavior by pointing out there was nothing that prevented the father from asking for visits or communicating with the child

through regular mail, by going through third parties, or by going to the mother's residence and communicating face-to-face. We find these excuses unpersuasive.

As to the claim she was available by regular mail, we find it unlikely to the point of being unbelievable that, having rebuffed all recent requests for contact and blocked all previously used methods of communication, the mother would all of a sudden be receptive to visits and communication because she received a letter in the mail. As to the use of third parties, the mother's excuse ignores the fact that, when the father attempted to use third parties to arrange visitation or even deliver gifts, the mother rebuffed the attempts and encouraged the third parties to not undertake the role of being a go-between. Finally, the mother's claim that the father could have simply shown up at her residence to communicate with the child or ask for visitation ignores the fact the mother had threatened the father with criminal charges if he did so. Simply put, the mother made a concerted effort to obstruct or interfere with all reasonable methods available for the father to request visits or communicate with the mother or the child.

We also find it appropriate to address the suggestion that the mother's efforts to prevent contact are excused because of the limited number of requests the father made or the father did not move quickly enough to seek a court order requiring visitation.

As to the number of requests, there is support in our case law that marginal or half-hearted efforts to exercise visitation are not enough to ward off termination on the ground of abandonment. *See, e.g.*, *In re G.A.*, 826 N.W.2d 125, 130 (Iowa Ct. App. 2012) (affirming termination when "at best only marginal efforts to communicate" with the child were made); *In re D.S.P.*, No. 09-1188, 2010 WL

445690, at *3 (Iowa Ct. App. Feb. 10, 2010) (affirming termination when father "made only half-hearted efforts to communicate with" the child). However, the principles established by those cases should not be viewed as somehow endorsing a custodial parent's denial of reasonable requests for contact. Those cases should also not be viewed as endorsement of treating abandonment as some type of game in which the non-custodial parent must repeatedly pester the custodial parent for visits an unspecified number of times before being deemed to have tried hard enough to avoid a claim of abandonment. When a non-custodial parent is repeatedly rebuffed in that parent's efforts to see the child, there comes a point when that parent may understandably give up. In that situation, the case may be properly viewed as one in which the custodial parent has prevented access than one in which the non-custodial parent has abandoned the child. *See In re H.N.M.*, No. 17-1802, 2018 WL 2731643, at *4, *9 (Iowa Ct. App. June 6, 2018) (affirming denial of termination after referencing the juvenile court's conclusion that the non-custodial parent had reached a point of "learned helplessness" when the parent stopped asking for visits after repeatedly being rebuffed).

As to the suggestion that the mother's efforts to deny access are excused because the father did not have a visitation order, we note the abandonment statute imposes no such requirement on the father and provides no such safe harbor for the mother. *See* Iowa Code § 600A.8(3)(b). With no visitation order in place, the mother was within her rights to place reasonable restrictions on the time and manner of the father's contact with the child that took into account the circumstances, including the father's situation and the child's lack of familiarity with the father. *See G.A.*, 826 N.W.2d at 129 (acknowledging it was "fair and

reasonable" for the mother to request phone contact at first to reacquaint the child with a father who had been absent before granting in-person visits). However, there is no indication in the record that the father was asking for visits of unreasonable time or nature. By all indications, the father seemed to understand that his time with the child would need to be supervised and limited to some degree early on to take into account the child's lack of familiarity with him stemming from his repeated periods of incarceration and lack of contact. Rather than working with the father to place reasonable restriction on the father's visits, the mother simply refused or ignored his requests.

Given the above-described details, we conclude the mother acted in such a way as to prevent the father's contact with the child. Therefore, serious consideration must be given to reversing the juvenile court's decision finding abandonment. However, having given such consideration, and acknowledging it is a close call, we are persuaded to affirm the juvenile court by the father's own testimony regarding the extent of his aspired contact with the child. In response to questioning about his history of visits and why he did not file a petition seeking visitation sooner, the father acknowledged that he did not feel the need to do so during a period in which he received three or four brief visits with the child in the year following his first release from prison. Based on this testimony and the other evidence in the record, it appears the father's desired involvement with the child consisted of wanting a sporadic visit every three or four months and providing her with birthday and Christmas gifts each year. This falls far short of what the Iowa Code requires of a non-custodial parent to avoid a conclusion the parent has

abandoned the child. *See* Iowa Code §§ 600A.1(2), .2(20), .8(3)(b)(1)–(2).[1] In other words, we conclude that, even if the mother had not obstructed the father's efforts to visit or communicate with the child, the level of involvement with his child the father found acceptable would still fall within the statutory definition of abandonment, as it is the father's actions, not his intent, that determine the outcome. *See In re C.A.V.*, 787 N.W.2d 96, 101 (Iowa Ct. App. 2010) ("A parent demonstrates an intent to abandon a child even though the parent subjectively maintains an interest in the child if that interest is not accompanied by 'affirmative parenting to the extent practical and feasible in the circumstances.'" (quoting *In re Goettsche*, 311 N.W.2d 104, 106 (Iowa 1981))); Iowa Code § 600A.8(3)(c) (stating a parent's subjective intent unsupported by evidence of acts specified in section 600A.8(3)(b) manifesting such intent does not preclude a determination of abandonment). The father is also delinquent in his child support obligation, which is a factor to consider with regard to a claim of abandonment. *See In re W.W.*, 826

---

[1] Iowa Code section 600A.1(2) states:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of the parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code section 600A.2(20) defines "[t]o abandon a minor child" to mean:

> a parent . . . rejects the duties imposed by the parent-child relationship . . . , which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child.

N.W.2d 706, 710–11 (Iowa Ct. App. 2012). In short, the father expressed no intent and exhibited no actions demonstrating a willingness to establish and maintain "a place of importance in the child's life." *See* Iowa Code § 600A.1(2).

On our de novo review, we agree the mother established statutory grounds of abandonment in spite of her inappropriate efforts to block the father's access to the child.

**AFFIRMED.**